The final appeal we'll hear today is appeal number 18-1209, DynCorp International v. United States. Mr. Panner. Good morning, Judge Chen. May it please the court. We've explained in our briefs why each of three significant errors in the contracting officer's selection decision requires, at a minimum, that the procurement be remanded to the agency for further consideration. This morning, I'd like to focus on the first two of those issues. First, with respect to the evidence of impropriety on the part of AAR, the contracting officer's decision was arbitrary and capricious for both of two reasons. First, it failed properly to consider whether AAR's conduct created an appearance of impropriety. Instead, considering solely whether there was an appearance of a specific statutory violation or a basis for finding that AAR was not a responsible contractor, this court's cases make clear that that is not the correct standard. Secondly, the contracting officer's decision rested on a factual finding, including multiple factual findings, but in particular on the finding that AAR did not seek, obtain, or use confidential and proprietary DynCorp information that is contrary to the evidence in the record that the government does not defend. So that's with respect to the first issue. With respect to the second issue, which is... With respect to the first issue, then, I know you're going through your list quickly, but just very quickly, you say that the contracting officer didn't address the question of appearance. I mean, he did say that he didn't find an appearance. Your argument, I take it, is that implicit in what he said and the way he said it, the context and so forth, is that he used the wrong standard? Correct, Your Honor. So what he said was that I don't find... He did say the words, I don't find an appearance of impropriety, see below. And then when he discussed the issue, he discussed it specifically with respect to whether there was an appearance of a violation of the Procurement Integrity Act or whether there was... And he also found that AAR was a responsible contractor. But again, that really ignored the principal point that... Or one of the principal points that DynCorp had relied on before the agency, which was that the various steps that AAR had taken to obtain... To seek, obtain, and use DynCorp's confidential information created at a minimum an appearance of impropriety. And again, the contracting officer never appropriately addressed that question. Now with respect to the disqualification of DynCorp for proposing that the IT associate contractor would take responsibility for the operations and maintenance of the MIS system after the transition, not only did the agency mislead DynCorp with regard to whether that was something that was within the discretion of the aviation contractor to propose, but more significant, perhaps, it treated AAR's proposal as superior, even though AAR's proposal, I think, reasonably read, takes that same approach. And with respect to this latter point, AAR said that, as directed by the contract operation... With respect to the COR, that it would deliver responsibility for operations and maintenance to the IT associate contractor. And in saying that, moreover, that proposal needs to be understood in light of technical evaluation notices that AAR had received that specifically said the IT associate contractor will have responsibility for the MIS operations and maintenance. And AAR's proposal actually refers to those TENs in the version that the agency accepted. And the only explanation for this, to be sure, the contracting officer said that, well, no, I understood AAR to be proposing that it would handle operations and maintenance throughout, but that explanation came only later. And therefore, under the CRA case and others, it's really entitled to less weight because it is essentially admissible to be sure, but it's a post hoc rationalization for the decision, which should not be given the same weight as contemporaneous evidence of the understanding of the contracting officer. Was there something ambiguous about the amendment to the solicitation that deleted the one sentence and replaced it with another? There was, Your Honor, because what the amendment did was it said, we're taking out this sentence and, but what it replaced it with was it said that the IT associate contractor would have responsibility for the existing information system until transition. What it did not say, which would have presumably been the way to eliminate the ambiguity, was it did not say that after transition, the aviation contractor will have responsibility for operations and maintenance. There's no doubt that design and implementation of the MIS was the responsibility of the aviation contractor, but what was not clear was what would happen after that transition. But when the Senate says that X will be the case until date Y, it seems to me the very strong implication is that the situation will be different after date Y, is it not? But the situation would be different if the question was whether the bidder chose to propose handling maintenance and operations itself or putting it in the hand of the IT associate contractor. And the reason that DynCorp was misled during the course of the evaluation was that with regard to several elements of the management information system, they received evaluation notices which said, in essence, is this going to be something that you handle or is it something that you expect to be put within the responsibility of the IT associate contractor? And that, by posing that question, it suggested that that was within the discretion of the offeror to choose that approach. Q Is there another way of reading it in the sense that perhaps the government felt like when it deleted the incorrect sentence from the solicitation and replaced it with something that's perhaps not as crystal clear as you would have liked it, but it's still informative? And then perhaps also in context with a particular question and answer about who's going to be handling the MIS, then this particular inquiry from the government about maybe it could be understood as simply saying, we cannot tell whether you've incorporated in your bid proposal that you will be taking responsibility over the MIS. Could you clarify that? Is that one way of reading it as opposed to inviting the bid proposal to either include operation and maintenance of MIS or not incorporating operation of the MIS into the bid proposal? A I apologize if I don't exactly understand the distinction your Honor is drawing, but let me just say that I think that the natural thing to do in the course of this discussion, if the proposal failed to address something that was within the responsibility of the bidder, is to say, you have responsibility for this and you have not shown how you're doing it, so please tell us how you're doing it. Rather than to say, are you planning to do this? Are you planning to have the IT associate contractor do it? I don't think that one should read that being a sort of sarcastic inquiry. It's presumably suggesting that these are two approaches. Please tell us which one you're going to pursue. And again, I think that the fact that the idea that this was so utterly clear that this was something that had to be handled by the aviation contractor is belied by the fact that in the AAR's proposal, even read as they say it should be read, it says, we'll transition as directed, we'll transition the operations and maintenance to the IT associate contractor. Why would they have said that if it was crystal clear that the aviation contractor was going to handle operations and maintenance? Again, at a minimum, because there was this misleading of DynCorp with respect to this aspect of the proposal and this disparate treatment with regard to the proposals that were received, and because there's no dispute actually that if this disqualification was mistaken, that the contracting officer's decision cannot be upheld, that this should go back, the procurement should go back to the agency and be reconsidered. And I think that one of the things that is significant about the third issue, which I said I wasn't going to talk about, but I'm going to now talk about it a little bit because I think it's significant to the relief. It really is, if you look at the plain language of the solicitation with respect to the inclusion of required elements within the four corners of the proposal, it made clear that anything that was not included within the proposal was not going to be considered and there's no dispute that AAR failed to include necessary staffing within the four corners of the proposal. They included it in a response to an evaluation notice. What should have happened at that point is that the contracting officer should have done further discussion, said, we have this proposal, it's not good enough, we need to have the proposal revised to reflect the staffing proposal, otherwise it's insufficient. But had that happened, then there would have been further discussions with DynCorp. So it's really by cutting off prematurely the process when the proposal was not complete and didn't address, simply accepting the proposal in its incomplete state, the contracting officer thereby disadvantaged DynCorp with respect to the opportunity to respond further. I see I mentioned my rebuttal time. All right, we'll save the remainder of your time and let's hear from Mr. Edelsheik. Yes, Your Honor. May it please the court. The trial court correctly held that the State Department had a rational basis with respect to each of the fact-intensive decisions that DynCorp challenges in this protest. For example, on procurement integrity, the agency conducted a detailed review, gathered sworn evidence, and wrote a 24-page memorandum before concluding that AAR did not violate the PIA. Now on appeal, DynCorp does not argue that AAR actually violated the Procurement Integrity Act, the PIA, or any other statute or regulation. Instead, DynCorp is arguing that AAR engaged in what they call misconduct by obtaining five-year-old information pertaining to DynCorp's incumbent contract. However, the Procurement Integrity Act is not a catch-all for all business ethics issues. It only governs bid and proposal information, and none of the DynCorp information in AAR's possession was used in any DynCorp bid or proposal. That's undisputed. So the Procurement Integrity Act doesn't govern here. Now, of course, business ethics is also a subject that comes up in the responsibility determination under Part 9 of the FAR. However, the contracting officer's detailed responsibility assessment is not challenged by DynCorp on appeal. So the alleged impropriety is an appearance of a PIA violation. The contracting officer carefully examined that question and ultimately found that the PIA... Is it an appearance of a PIA violation or an appearance of impropriety not necessarily tied to the PIA, in your view? This appearance of impropriety concept comes up in a few different contexts. It comes up in the Procurement Integrity Act context. It also has come up in the organizational conflict of interest context. And it certainly can come up in the responsibility context. But the impropriety has to be connected to some violation of law. And there's been no allegation that there was any violation of law here. But it could be related to the theft of a trade secret? Not. It could be, but... In other words, not a violation technically. I certainly am not familiar enough with the FAR to be able to say that the trade secret of misappropriation is not within the FAR. But if it's not, would that be sufficient to constitute an appearance of impropriety? If we're talking about the Procurement Integrity Act, if that trade secret information that was stolen was used in a bidder proposal, then it would be an appearance of a PIA violation. Otherwise... But it would be a PIA violation, would it not? Period. Never mind appearance. Potentially. My question really goes to what the role of this notion of an appearance is, where you may not have an actual violation, but you have something that just makes the entire acquisition look very bad. Okay. So an appearance versus an actual violation, there's an important distinction here. Where there is an actual violation, bid and proposal and that's a violation. When you're talking about the appearance, well, what if the offeror hires somebody who has seen bid and proposal information? They don't actually get the bid and proposal information in and of itself. So there's no violation of the Procurement Integrity Act. But nonetheless, because they hired somebody who has that bid and proposal information potentially in their head, that's an appearance of impropriety. Is that what happened here? No, Your Honor, because there is no dispute that none of the DynCorp information that was in AAR's possession was used in any DynCorp bidder separate questions here. Your question goes to AAR's initial proposal. But for the PIA analysis, the question is, is this DynCorp bidder proposal information? And none of the DynCorp information that AAR had was DynCorp bid and proposal information. It was from DynCorp's predecessor contract, right? That's right. That information. That's right. And the contracting officer specifically found that, quote, seeking information about an incumbent contract is not uncommon and is generally done by offerors. He found no misconduct here. And regardless, the contracting officer found based on sworn evidence that AAR did not rely upon any DynCorp information of any kind in its final proposal. Its final proposal. The initial proposal, different result? With respect to the initial proposal, there was some behind-the-scenes work where an employee did make use of the DynCorp information, but due to an irony in this case, AAR actually forgot to include it in their original proposal. Was this the Hamilton information or the Peterson information? The Hamilton salary information was used to generate a spreadsheet that ultimately AAR forgot to use. So if AAR had not forgotten, it would have been part of AAR's final proposal? No, Your Honor. That was the initial proposal you were talking about, right, with me? Yes, the initial proposal. Actually, no, Your Honor, because... I guess I wasn't following your train of thought when you said they'd forgotten to AAR forgot to include the Hamilton salary information in the original proposal. In the initial proposal. The original proposal, that's right. They forgot to include their key and essential employee salaries, and actually DynCorp pointed that out in one of their many protests before the GAO. I don't understand. Are you saying that the Hamilton information was not used in either the final proposal by AAR or the initial proposal by AAR? Correct. That's absolutely correct. And the contracting officer also did a deep dive and compared the two proposals side by side and found there were no similarities in the labor rates between the two proposals, no overlap at all in the two proposals. We're talking about the final proposal now? Yes. What about the initial proposal? The initial proposals, back in 2016, there was an initial PIA review that the contracting officer conducted, and he also found no overlap and no similarities between the labor rates. So the contracting officer did that analysis twice, once initially and then again during the remand. Could you address the IT associate contractor MIS issue? Certainly, Your Honor. DynCorp argues that the solicitation itself did not cover the O&M work for the MIS. This is directly contrary to the solicitation language that they don't even bother to address. Their arguments are predicated on an assumption that the things that eviscerate their arguments don't exist. For example, the very first evaluation criteria was administration and maintenance, including the MIS. And the solicitation says that the contractor, the aviation contractor, will input and maintain the preponderance of the data in the MIS. Of course, AAR wasn't clear about that, I take it? Yes, they were, Your Honor. Initially, did they not propose using a contractor for that work? No, Your Honor, they did not. What they did was they proposed to do all the O&M work from inception all the way to contract closeout. The entire life cycle, they proposed to do that work. They had included that work in their proposal in every single year of all of the sentence that's seized upon by DynCorp, which is to say, if a contracting officer's representative asks us to transfer it, we'll do whatever the government wants. It didn't quite say that. It said, I think, as requested by the contracting officer's representative, not if. That's the argument that your opposing counsel is making. It's predicated on that difference, it seems to me. Well, I'm arguing as the agency understood it. The language itself was more ambiguous. Yes. It's a potentially ambiguous sentence and it was incumbent upon the contracting officer to weigh that evidence in the first instance. It certainly could be... I understand the argument. I thought there was some point at which AAR actually did propose to have the MIS work done by a contractor. Is that not true? Am I misremembering? No, your honor. I believe there was an argument made to that effect by DynCorp and it's not supported by the record. Okay. All right. Go ahead. Sorry. Just very briefly, your honor. The Q&A 197 specifically directed offerors to assign the MIS operation and maintenance costs to a particular line item. That's in the appendix at 103-399. Amendment six to the solicitation at 103-966 says the still the contractor's responsibility and pertain to the MIS proposed by the successful offeror. I know what I was thinking about. I think I was thinking about Q&A 21. Wasn't that response, the Q&A I'm talking about, wasn't that a response to AARs in which the government said, no, no, this isn't to be done by the IT contractor? That's right, your honor. There were at least... That leads me to believe that AAR had a misapprehension before that. Now, the Q&A was the government saying you can't do it with an IT contractor, right? No. No, your honor. Q&A 21, that's what I'm... I'm sorry. Q&A 21 is what I'm talking about, right? It supports the agency's interpretation of the solicitation. I understand that, but it was an answer to AAR, was it not? I don't recall who asked that particular question, but regardless of who asked it, the answer was clear and consistent. You need to be performing this MIS work. The IT associate contractor will not be performing that work. Right. My only concern is that it sounds like somebody was not clear as to the proper allocation of work until at least Q&A 21. Your honor, there was that stray sentence in the solicitation that was ultimately deleted that did create some questions about this, and that's why you had Amendment 6, Q&A 197, and the other underlying provisions in the solicitation never addressed by DynCorp, which clearly set forth the requirement for O&M work to be done by the aviation contractor. Very briefly, DynCorp was not misled in discussions. Essentially, the complaint is that the evaluation notices could have been a little bit more clear in reminding DynCorp, an experienced government contractor, that it should have been following the terms of the solicitation. Okay. Thank you. Let's hear from your co-counsel, Mr. Cohn. Thank you, your honor. May it please the court. The contracting officer most certainly did address the argument about the appearance and propriety. It is on page 126092 of the appendix and 126095, and I quote from there, while DI appears to recognize that the information is not covered by the PIA, it argues that there are appearance issues and that AAR lacks a positive record of integrity and business ethics. I do not agree that the facts support these assertions. The contracting officer was correct in his thorough 24-page opinion, and the statute does not require any more specificity or analysis than the thorough analysis that he gave. I want to identify a few factors, which you mentioned in the brief, which confirmed that AAR was acting scrupulously and proactively. Before you do that, since this pertains to your client, or at least I think it does, am I misreading the exchange on Q&A 21? Was the question that was asked by AAR in Q&A 21? The identity of the questioner is not provided, so it does not say whether AAR asked it or DI asked it, but the government is correct that the Q&A 21, along with amendments 5 and 6, made abundantly clear that we had to maintain the nerve center. But somebody asked the question. Someone asked it in the beginning, because there was the relic, the old relic from the prior procurement, but once the question was answered and once you got amendments 5 and 6, it was abundantly clear. In addition, the TEN that my colleague here mentions, TEN 130, said unambiguously that new MIS activities and any required IT components should be included in the proposal, in DI's argument they were duped until the court below, the Court of Federal Claims. This is a new argument, because it was a meritless argument. They knew full well that they had to maintain the nerve center, and of course they did. It was the nerve center of all the operations. Their argument here is meritless. Going back to the integrity issue, if I have five seconds left, the record unambiguously confirms that we were scrupulous, we did the investigation, we're the ones who identified Anita Hamilton, we told the government, we shared everything. Those are not the actions of corporate espionage. Those are the actions of a scrupulous contractor. Thank you, Your Honors. Mr. Four minutes. Thank you, Your Honor. I think that my colleague's argument actually reinforces the reason that the decision below should be reversed and the case remanded to the agency, because the contracting officer did improperly confuse the question whether there was a violation of the Procurement Integrity Act or an appearance of a violation of one, with the question, the broader one, whether there was an appearance of impropriety which could be caused by something like, for information of a competitor. That's really the essence of the concern that was being addressed here and that the OIG, I think, recognized in its investigation memo. That is to say that AAR had an employee that it knew was a former employee of DynCorp, and it obtained extensive information about DynCorp's business practices from that employee, and those were sent to the highest levels, the high-level executives at AAR. Ms. Hamilton, at least, sent them way up the chain, but it didn't look like there was any solicitation on the part of the high executives, correct? There was, because not solicitation originally. In other words, she may have done that on her own initiative, but they responded and asked for clarification about the information that she provided. They were well aware of what the information was. They knew that it was for clarification. What exactly did they ask for? They asked for additional information. This is not something I'm familiar with, that part of the exchange between Hamilton and the AAR executives. I would point you, for example, to a lot of these documents appear in the joint appendix between AAR 26779 and going through to 127092. You will see that Ms. Hamilton sends the document to Mr. McGillivray on 26779, who then forwards it on to another employee at AAR to use. That's not an exchange. I do know that there are examples in the record where there were requests that went back and asked for further information about some of this material. This is all taking place in 2014. This information is used in developing the original proposal. I do think that the record will reflect, as we address in our brief on page 17 and note 7, this information was used in developing the salary proposals, the cost proposals, as opposed to the technical proposals. It is true that DynCorp pointed out that there was something missing in the technical proposal with regard to proposed salaries, but this information was used in developing the initial proposal. The OIG found that that was the case. But I do want to get back to the legal point that is significant, is that the PIA has specific aspects that it refers to, and I think that, again, my friend's argument underscores this. He says, well, it wasn't DI bid information, because when DI did its bid, it didn't use this information to develop the bid. But A, it was confidential and proprietary DynCorp information that was provided by a former employee to AAR, and AAR then used that information in developing its proposal. And so that could certainly be found. The government, in fact, acknowledges in its brief that given the fact-specific nature of the proposal, it would have been possible, or at least it entertains the possibility, that the contracting officer could have found that there was an appearance of impropriety. And yet the decision that was under review suggests that there's actually a legal barrier to finding an appearance of impropriety because of the nature of the information that was used. And that, I think, is erroneous. And with regard to the Mr. Panner, we have to go. You have 10 seconds. Perfect. Because I just want to point out that the very sentence that Mr. Cohn relied on in defending the decision of the contracting officer with respect to responsibility on 126095 is based specifically on the finding that nothing in the record shows that they solicited, obtained, or used confidential and proprietary information, which is contrary to the finding of the OIG and contrary to the evidence in the record. Okay, thank you very much. The case is submitted.